02-CV-01303-M

The Honorable John C. Coughenour

CC TO JUDGE

DJ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUGH HARDAGE, an individual,

Plaintiff,

v.

CBS BROADCASTING, INC., a New
York Corp.; VIACOM TELEVISION
STATIONS, INC., a Delaware Corp.;
VIACOM BROADCASTING OF
SEATTLE, INC., a Delaware Corp.; and
KATHY SPARKS, an individual,

Defendants.

NO. CV02-1303C

**PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
ON THE ISSUE OF VICARIOUS
LIABILITY FOR CBS**

**NOTE ON MOTION CALENDAR:
AUGUST 15, 2003**

## I. RELIEF REQUESTED

Plaintiff Hugh Hardage ("Hugh") requests entry of partial summary judgment that,

as a matter of law, CBS Broadcasting, Inc., Viacom Television Stations, Inc., and

Viacom Broadcasting of Seattle, Inc., (collectively referred to, hereinafter, as "CBS") are

vicariously liable for the conduct of Kathy Sparks. First, CBS is vicariously liable if

Plaintiff proves at trial that he was constructively discharged because constructive

discharge constitutes a tangible employment action. Second, even if no tangible

employment action is found, CBS is vicariously liable as a matter of law for the conduct

of Sparks because they cannot prove the affirmative defense to liability.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 1

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

ORIGINAL

Plaintiff's motion for partial summary judgment is limited solely to the issue of vicarious liability, that is, assuming Plaintiff proves sexual harassment, CBS is vicariously liable for the conduct of Ms. Sparks. However, in order to put that claim into context for the Court, Plaintiff sets forth the facts that establish the hostile work environment below. While CBS may dispute the facts related to specific instances of harassment, the facts that are material to this motion, mainly that complaints were made by Mr. Hardage and CBS's response, are undisputed.

## II. DESCRIPTION OF PARTIES

Hugh Hardage is a 38-year-old single man who friends routinely describe as gregarious, outgoing, and caring. *See* Declaration of Claudia Kilbreath ("CK Decl.") Ex. 1, T. Goggin dep., at p. 28, ll. 16-21, p. 29, ll.19-24; Ex. 2, Elbert dep. at p. 14, ll. 10-16. Kathy Sparks, Defendant, is 48 years old and no longer employed with CBS since her contract was not renewed in November of 2002. *See* CK Decl., Ex. 3, Sparks dep., at p. 7, ll. 2-4. KSTW, where Hugh worked, was part of the Paramount Stations Group that is now owned by Defendant CBS since its merger with Defendant Viacom. *See* CK Decl., Ex. 4, Rajewski dep., at p. 8, l. 15 – p. 9, l. 6.

## III. STATEMENT OF FACTS

Hugh Hardage was hired as an Account Executive for KSTW in August of 1998 to sell advertising for broadcast. *See* CK Decl., Ex. 5, Hardage dep., at p. 61, ll. 3-14. In September of 1999, Kathy Sparks was hired as Vice President/General Manager of the Station. *See* CK Decl., Ex. 3, Sparks dep. at p. 5, l. 25- p. 6, l. 1, and p. 12, ll. 16-17. As such, she was the boss of all the employees. *See* CK Decl., Ex. 3, Sparks dep., at p. 19,

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 2

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

ll. 6-9. Patty Dean, the General Sales Manager, acted as Hugh's direct supervisor. *See* CK Decl., Ex 6, Dean dep., at p. 7, ll. 5-8, and p. 28, ll. 3-5. Although Ms. Dean was Hugh's direct supervisor, Ms. Sparks was very clear that Ms. Dean always involved her prior to making personnel decisions, that Ms. Dean was required to involve her, and that she generally had to first get Ms. Sparks' approval. *See* CK Decl., Ex. 3, Sparks dep. at p. 19, l. 19-p. 20, l. 10. In February of 2000, Hugh was promoted to Local Sales Manager by Ms. Sparks and Ms. Dean. *See* CK Dec., Ex. 3, Sparks dep., at p. 29, l. 23- p. 30, l. 3.

Shortly after Hugh was promoted, Ms. Sparks' actions toward Hugh became increasingly inappropriate and unprofessional. The first notable event occurred on Easter of 2000. *See* CK Decl., Ex. 5, Hardage dep., at p. 14, l. 13. Hugh, Ms. Sparks, Patty Dean and her husband, and Tim and Jincey Goggin all decided to have brunch at the Sorrento Hotel because their families all live elsewhere. *See* CK Decl., Ex. 6, Dean dep. at p. 30, l. 25–p. 31, l. 8. Ms. Sparks had several mamosas during brunch. *See* CK Decl., Ex. 3, Sparks dep. at p. 24, l. 22-p. 25, l. 3.

The party then decided to go to Jillian's to play games and have a few more drinks. *See* CK Decl., Ex. 3, Sparks dep. at p. 25, ll. 4-17. Ms. Sparks admits to having several more drinks at Jillian's. *See* CK Decl., Ex. 3, Sparks dep., at p. 25, ll. 18-23. While there, Ms. Sparks draped her foot over an air hockey table where Tim and Hugh were playing and asked Hugh if he thought that her feet were cute. *See* CK Decl., Ex. 1, T. Goggin dep. at p. 18, ll. 6-10; Ex. 3, Sparks dep. at p. 95, ll. 4-7. Later, she jumped up on a one-person skateboard game behind Hugh, put her arms around him, and told him he

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 3

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

had a cute ass. *See* CK Decl., Ex. 5, Hardage dep. at p. 14, ll. 20-22. Mr. and Mrs. Goggin witnessed the incident, as well as the fact that Hugh pushed away from Ms. Sparks and appeared visibly upset. *See* CK. Decl., Ex. 1 , T. Goggin dep. at p. 10, l. 24- p. 11, l. 13; Ex. 7, J. Goggin dep. at p. 16, l. 23 –p. 17, l. 5. Ms. Sparks admits jumping up behind Hugh and pressing herself against him. *See* CK Decl., Ex. 3, Sparks dep. at p. 65, ll. 3-20. She described this incident as "not any big deal." *See* CK Decl., Ex. 3, Sparks dep. at p. 65, ll. 5-6.

After Jillian's, the group went to the Paragon restaurant to have dinner. Ms. Sparks was making inappropriate sexual remarks to Hugh, culminating in her decision to take off her shoe, slide under the table, and put her foot in Hugh's crotch. *See* CK Decl., Ex. 1, T. Goggin dep. at p. 12, ll. 10-21. Ms. Sparks' version of events is that she was wearing "slippery pants" and that she slipped and her foot went right next to Hugh. *See* CK Decl., Ex. 3, Sparks dep. at p. 67, ll. 4-15. Mr. Goggin recalls that she was wearing a leather miniskirt. *See* CK Decl., Ex. 1, T. Goggin dep. at p. 9, ll. 9-14.

Two days later, Ms. Sparks called Hugh and told him that she wanted him to meet her for drinks after work at the Icon Grill. *See* CK Decl., Ex. 3, Sparks dep. at p. 84, l. 22-p. 85, l. 1. When he arrived at the restaurant, she was sitting back in a corner where no one could see them and instead of apologizing, she asked Hugh if he felt the same way that she did about him since that night, indicated that she had not been able to sleep, and was having orgasms thinking about him. *See* CK Decl., Ex. 5, Hardage dep. at p. 176, ll. 13-16. Ms. Sparks admits that the meeting was held but claims that it was her telling

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 4

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

Hugh that she did not want a relationship. *See* CK Decl., Ex. 3, Sparks dep. at p. 85, ll. 4-17 and p. 86, l. 25-p. 87, l. 10. Ms. Sparks admits that she could have held the meeting in her private office. *See* CK Decl., Ex. 3, Sparks dep. at p. 85, l. 18-p. 86, l. 17.

From this point forward, Hugh tried to stay away from Ms. Sparks as much as possible, and he told Ms. Dean he did not want to be alone with Ms. Sparks. *See* CK Decl., Ex. 5, Hardage dep., at p. 262, ll. 5-10; p. 265, ll. 15-18. He tended to avoid social functions where he knew that she would be present. *See* CK Decl., Ex. 5, Hardage dep., at p. 24, l. 18- p. 25, l. 11. In the meantime, Ms. Sparks persisted in her pursuit of Hugh. Mr. Elbert, whose office was directly across from Hugh's office, noticed her flirting, bantering with Hugh, and spending much more time with Hugh than anyone else. *See* CK Decl., Ex. 2, Elbert dep. at p. 16, l. 18- p. 20, l. 1.

In August of 2000, Ms. Sparks' assistant, Diane Goins, arranged for her to take the same flight to Texas as Mr. Hardage was on. *See* CK Decl., Ex. 5, Hardage dep., at p. 229, ll. 22-24. Ms. Goins denies this fact and states that it was just a coincidence, but Ms. Sparks admitted that it was not. *See* CK Decl., Ex. 3, Sparks dep. at p. 57, ll. 6-10. On the flight, Ms. Sparks had several drinks. *See* CK Decl., Ex. 3, Sparks dep. at p. 56, ll. 15-19. She told him that sex with her would be "life altering." *See* CK Decl., Ex. 5, Hardage dep. at p. 233, ll. 24-25. She rubbed her foot on his leg and touched his back to the point where Hugh was so uncomfortable that he got up and left. *See* CK Decl., Ex. 5, Hardage dep. at p. 16, l. 15-p. 17, l. 2. When he came back, Ms. Sparks put her hand on his leg, grabbed his hand and dragged it across his crotch, and said "Sometimes what you

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 5

456708.1/022504.00001

want is right here," followed by, "One blow job from me, and you'll never think about her [Hugh's girlfriend] again." *See* CK Decl., Ex. 5, Hardage dep. at p. 17, ll. 3-8.  Her behavior led other passengers to assume she was Hugh's girlfriend. *See* CK Decl., Ex. 5, Hardage dep. at p. 232, l. 22-p. 233, l. 10.  When she returned to the office, she bragged about her sexual pursuit of Hugh, the number of drinks that she had, and pretending that Hugh was her fiancée. *See* CK Decl., Ex. 8, Goins dep. at p. 10, ll. 8-23 (sister-in-law of Ms. Sparks' secretary).

In October of 2000, a group of people from work, including Ms. Sparks, decided to go to Pesos restaurant. *See* CK Decl., Ex. 3, Sparks dep. at p. 30, ll. 17-25.  Hugh knew quite a few women there and was greeted warmly by his friends. *See* CK Decl., Ex. 2, Elbert dep. at p. 14, ll. 10-16.  He circulated around the room saying hello to people. *Id.*  Ms. Sparks would not take her eyes off of him, glared at him the entire time, and ultimately had a complete melt down. *See* CK Decl., Ex. 2, Elbert dep. at p. 14, ll. 17-25; Ex. 7, J. Goggin dep. at p. 21, ll. 10-15.  She was staring at him in a sexual and yet angry way. *See* CK Decl., Ex. 1, T. Goggin dep. at p. 16, l. 17-p. 17, l. 2.  In front of everyone, she shouted: "who in here haven't you fucked; don't they know who I am; I am Kathy!" *See* CK Decl., Ex. 2, Elbert dep. at p. 15, ll. 1-10.  Hugh quickly herded her into a cab along with Leo Elbert. *See* CK Decl., Ex. 2, Elbert dep. at p. 15, ll. 17-20.  When they arrived at the office, Hugh attempted to minimize the incident, but Ms. Sparks said, "Don't fucking talk to me, you're finished," then she slammed the car door and stomped off. *See* CK Decl., Ex. 2, Elbert dep. at p. 15, l. 24-p. 16, l. 2.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 6

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Pesos incident was the final straw for Hugh. It was difficult for him to confide in Patty Dean because she and Ms. Sparks were very close. *See* CK Decl., Ex. 1, T. Goggin dep. at p. 28, l. 24-p. 29, l. 1. Nevertheless, he decided to go to Ms. Dean and told her that the night before things had gone way too far. *See* CK Decl., Ex. 5, Hardage dep. at p. 23, ll. 1-17. He told her about Ms. Sparks losing her temper, ignoring Jincey, and the cab ride with Leo to calm her down. *See* CK Decl., Ex. 5, Hardage dep. at p. 24, ll. 6-17. Ms. Dean recalls the complaint as taking place after a company dinner where Ray Rajewski was present. *See* CK Decl., Ex. 6, Dean dep. at p. 18, ll. 3-14 and p. 19, ll. 1-12. In any event, Ms. Dean admits that Hugh complained about Ms. Sparks and told her that Ms. Sparks had made comments that bothered him. *See* CK Decl., Ex. 6, Dean dep. at p. 24, ll. 21-25. She believed that he was reporting sexual harassment and so she told Hugh that she would need to report the matter to Ray Rajewski. *See* CK Decl., Ex. 6, Dean dep. at p. 21, ll. 5-14.[1]

In fact, Ms. Dean did report the incident, which she described throughout her testimony as a complaint of sexual harassment, to Mr. Rajewski. *See* CK Decl., Dean dep. at p. 24, l. 21-p. 25, l. 3. He, in turn, took it to their Human Resources professional, Paul Falcone, who is very experienced in employment laws. *See* CK Decl., Ex. 4,

---

[1]   The fact that some of the harassment occurred away from the work site does not insulate CBS or Ms. Sparks from liability because the events were work related and Ms. Sparks abused her authority in order to sexually harass Hugh. *See, Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 308 (5th Cir. 1987); *Huitt v. Market Street Hotel Corp.*, 62 FEP Cas. 538 (D.Kan. June 10, 1993); *Prichard v. Ledford*, 767 F.Supp. 1425 (E.D. Tenn. 1990)(considered owner's calling and following of employee after work as part of the harassment); *Haehn v. City of Hosington*, 702 F.Supp. 1526 (D.Kan. 1988)(concluding that off-duty sexual conduct is relevant to a claim of sexual harassment); *Priest v. Rotary*, 634 F.Supp. 571, 575 (N.D.Cal. 1986)(considering owner's harassment of waitress who was off-duty at bar); *Schroeder v. Schock*, 1986 WL 15483 (D.Kan. Dec. 29, 1986).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 7

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

Rajewski dep. at p. 38, l. 24-p. 42, l. 23; Ex. 9, Falcone dep. at p. 39, l. 14-p. 40, l. 6.

Inexplicably, however, the complaint was never investigated. *See* CK Dec, Ex. 9,

Falcone dep. at p. 56. Mr. Falcone did not set up a formal meeting with Hugh; instead,

he talked to him for 15-20 minutes as Hugh drove him back to the airport to catch a flight

in October of 2000. *See* CK Decl., Ex. 9, Falcone dep. at p. 43, ll. 1-20. Hugh told him

that his boss had "feelings for me." *Id.* Mr. Falcone inferred from this statement that Ms.

Sparks was hitting on him and that it made him feel uncomfortable. *See* CK Decl., Ex. 9,

Falcone dep. at p. 52, ll. 4-20.

Although this information was enough by itself to trigger an investigation (not to

mention the fact that Hugh had already complained about it once to Patty Dean), Mr.

Falcone took no action to investigate the complaint. *See* CK Decl., Ex. 9, Falcone dep. at

p. 56, ll. 18-24. Mr. Falcone simply suggested that Hugh do nothing and hope that the

situation resolve itself, talk to Ms. Sparks one-on-one nicely, or let Mr. Falcone talk to

Ms. Sparks and tell her to "lay back on this a little bit." *See* CK Decl., Ex. 9, Falcone

dep. at p. 45, l. 5- p. 47, l. 1. Mr. Falcone reported to Mr. Rajewski that there was

nothing to report and that the matter did not need to be brought to Kathy Sparks'

attention. *See* CK Decl., Ex. 9, Falcone dep. at p. 56, l. 25-p. 57, l. 4.[2]  CBS cannot

dispute that Mr. Falcone's actions were completely contrary to his recommended protocol

for handling sexual harassment complaints; Mr. Falcone, who is published in the Society

for Human Resource Magazine, has written extensive articles to the effect that an

---

[2]     By way of background, our expert's summary of the relevant facts and her conclusions are attached as
Exhibit 11.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 8

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

investigation is *required* once an employer is on notice of the harassment. *See* CK Decl.,
Ex. 10, "Hold That Thought" (can't have a confidential or off the record discussion if it
involves harassment; can't turn a blind eye to employees' requests when you either knew
or should have known about a problematic workplace situation).

The harassment thus continued. During a dinner at the Kingfish restaurant with
Ms. Sparks' mother, Ms. Sparks wrapped her coat around Hugh outside and started
rubbing his chest and rubbing her leg up against him. *See* CK Dec., Ex. 5, Hardage dep.
at p. 17, ll. 9-13 and p. 18, ll. 1-25. When he backed away, she said "oops - sexual
harassment." *Id.* Hugh assumed that she was mockingly referring to his complaint so at
dinner he brought it up. *See* CK Decl., Ex. 5, Hardage dep. at p. 20, ll. 3-4. Ms. Sparks
was completely shocked and said "I knew that I had to fear you motherfucker." *See* CK
Decl., Ex. 5, Hardage dep. at p. 20, ll. 10-11. In fact, she had never been told or
interviewed about the complaint. *See* CK Decl., Ex. 3, Sparks dep. at p. 37, l. 3-p. 38, l.
1.

From that point forward, Ms. Sparks began to treat Hugh differently. *See* CK
Decl., Ex. 5, Hardage dep. at p. 31, l. 7-p. 32, l. 1. At meetings and social functions, Ms.
Sparks began to make snide remarks about women that he had dated. *See* CK Decl., Ex.
5, Hardage dep., at p. 32, ll. 8-24. She also repeatedly threatened him about his
performance, saying things like, "it's not going to be me that loses my job, it's going to be
you," (*See* CK Decl., Ex. 5, Hardage dep. at p. 33, ll. 20-22) and "You're not going to
have to worry about it; your number's up anyway," (*See* CK Decl., Ex. 5, Hardage dep. at

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 9

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

p. 34, ll. 2-3).  Ms. Sparks admitted making comments like this one.  *See* CK Decl., Ex. 3,

Sparks dep. at p. 98, ll. 20-24.  Hugh received phone calls from Ms. Sparks' assistant,

Diane, telling him to watch his ass.  *See* CK Decl., Ex. 5, Hardage dep. at p. 38, ll. 15-19.

Christa Goins, who was Diane's sister-in-law and close friend, heard that Ms. Sparks was

making all sorts of retaliatory comments about Hugh, such as referring to herself as a

"Black Widow" and that she could fuck him and fire him the next day.  *See* CK Decl., Ex.

8, Goins dep. at p. 13, ll. 9-14, and p. 19, ll. 9-17.  Ms. Goins is reliable because she was

close friends with Ms. Sparks; they socialized frequently, had lunch at least once a week,

and went out to dinner a couple of times a month.  *See* CK Decl., Ex. 12, Riley dep. at p.

9, l. 19-p. 11, l. 2.

The retaliation was highlighted by Ms. Sparks' treatment of Hugh compared to

similarly situated employees.  In October of 2000, Nadene Stauffer was appointed Local

Sales Manager to share the responsibility with Hugh.  *See* CK Decl., Ex. 5, Hardage dep.

at p. 75, ll. 15-24; Ex. 6, Dean dep. at p. 35, ll. 16-20.  Ms. Stauffer was not disciplined

for misconduct or provided written memorandums regarding the poor performance of the

station which was caused almost exclusively by the downturn in the market at the time.

*See* CK Decl., Ex. 4, Rajewski dep. at p. 19, l. 10-p. 21, l. 14.  Hugh, on the other hand,

was reprimanded. *See* CK Decl., Ex. 5, Hardage dep. at p. 90, l. 22-p. 91, l. 23.  Ms.

Sparks admitted that she was involved in the decision to reprimand Hugh and that it was

her idea to escalate the issue by calling legal counsel in Human Resources for guidance

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 10

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

on how to articulate the disciplinary action. *See* CK Decl., Ex. 3, Sparks dep. at p. 92, ll. 13-25.

When Hugh called Mr. Falcone to follow up with him regarding his complaint, he was told that Falcone had left the company. *See* CK Decl., Ex. 5, Hardage dep. at p. 28, ll. 10-17 and p. 30, l. 21-p. 31, l. 5. The situation worsened in July of 2001, when both Hugh and Ms. Sparks moved to an office in Renton. *See* CK Decl., Ex. 5, Hardage dep., p. 72, ll. 16-19. He was now forced to interact with her on a daily basis and her retaliation continued. *See* CK Decl., Ex. 5, Hardage dep. at p. 278, ll. 1-7 and p. 303, ll. 13-16. At the Christmas party that year, she was flirtatious with Hugh and rudely glared at his date, Amber Ternan, the entire time. *See* Ex. 13, Declaration of Amber Ternan at p. 1, l. 22-p. 2, l. 3. By August, the work environment had become intolerable and Hugh resigned, effective August 31, 2001. *See* CK Decl., Ex. 5, Hardage dep. at p. 159, ll. 11-24, p. 160, l. 24-p. 161, l. 6, p. 163, l. 18-p. 164, l. 15.

At all times, Hugh received superb performance reviews. *See* Ex. 14, Evaluations of Hardage; Ex. 15, Kathy Sparks 2000 Review; *see* CK Decl., Ex. 6, Dean dep. at p. 60, l. 17-p. 63, l. 14. The sole reason for Hugh's decision to leave employment was the harassment by Ms. Sparks. *See* CK Decl., Ex. 2, Elbert dep. at p. 44, ll. 20-22.

## IV.  LEGAL AUTHORITY  AND ARGUMENT

### A.  Standard for Summary Judgment

A party moving for summary judgment is not required to negate the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L.Ed.2d 265, 106 S.Ct. 2548, 2553 (1986). Rather, the moving party only needs to show an absence of material fact to

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 11

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

support the non-moving party's case. *Celotex*, 477 U.S. at 325. The non-moving party is required to show that there are genuine factual issues that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Failure to do so means the motion must be granted. *Anderson*, 477 U.S. at 249. It is not sufficient for the nonmoving party to merely "show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

A "material fact" is one that affects the outcome of the litigation. *Liberty Lobby, Inc.*, 477 U.S. at 248; *Ruff v. County of King*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995); *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993). Producing a genuine issue of material fact is not a simple standard to meet; there must be sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Liberty Lobby, Inc.*, 477 U.S. at 249 (citing *First Nat. Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 20 L.Ed.2d 569, 88 S.Ct. 1575 (1968)). If, however, reasonable jurors could reach but one conclusion, the trial court may decide the issue as a matter of law. *Allen v. State*, 118 Wn.2d 753, 760, 826 P.2d 200 (1992).

**B.    CBS is Vicariously Liable for the Conduct of Sparks If Plaintiff Proves At Trial That Hugh Hardage Was Constructively Discharged Because Constructive Discharge Constitutes a Tangible Employment Action.**

The Supreme Court has clearly provided an employer is strictly liable for the sexual harassment of an employee by a supervisor that results in a tangible employment action. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 12

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 808, 118 S. Ct. 2275, 141 L.Ed. 2d 662 (1998). In so holding the Supreme Court also provided a <u>non-exclusive</u> list of tangible employment actions: "A tangible employment action constitutes a change in employment status, *such as* hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *See Ellerth*, 524 U.S. at 761 (emphasis added).

Numerous lower courts that have since addressed the issue have held that a constructive discharge constitutes a tangible employment action. *See, e.g., Suders v. Easton*, 325 F.3d 432 (3rd Cir. 2003); *Joros v. Lodgemet Entertainment Corp.*, 294 F.3d 960, 966 (8th Cir. 2002); *Vasquez v. Atrium Door & Window Co. of Arizona, Inc.*, 218 F. Supp. 2d 1139, 1142-43 (D. Ariz. 2002). Once a constructive discharge is proven, the defendant is then strictly liable and precluded from raising an affirmative defense. *See Jackson v. Arkansas Dep't of Ed.*, 272 F.3d 1020, 1026 (8th Cir. 2001). Additionally, the *Jackson* court explicitly held that:

> If [plaintiff] was in fact constructively discharged, then the constructive discharge would constitute a tangible employment action and prevent the [defendant] from utilizing the affirmative defense.

*Jackson*, 272 F.3d at 1026, *cert. denied*, 122 S. Ct. 2366 (2002).

While the Ninth Circuit Court of Appeals has not yet addressed the issue, District Courts in the Ninth Circuit have held that a constructive discharge is a tangible employment action. *See, e.g., Vasquez v. Atrium Door & Window Co. of Arizona, Inc.*, 218 F. Supp. 2d 1139, 1142 (D. Ariz. 2002) ("After careful consideration of the issue, the

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 13

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

Court finds that a constructive discharge constitutes a tangible employment action.").[3] Such a finding is consistent with the fundamental principle of Ninth Circuit jurisprudence that a constructive discharge, when proved, operates as the functional equivalent of an actual termination. *See, e.g., Hess v. Multnomah County*, 216 F. Supp. 2d 1140, 1155 (D. Or. 2001) (finding that a "constructive discharge is legally equivalent to a [actual] termination."). As stated in *Suders v. Easton*, when referring to the identical principal of the Third Circuit, "this principle recognizes that when a plaintiff-employee successfully demonstrates that the work environment created by an employer was so intolerable that he or she had no choice but to resign, the constructive discharge becomes, for all intents and purposes, the act of the employer." 325 F.3d at 458.

In addition to being functionally equivalent to an actual termination, constructive discharge is a tangible employment action for the following reasons: (1) The Supreme Court intended the list of tangible employment actions to be non-exhaustive; (2) Such a finding is consistent with the remedial purposes of Title VII; and (3) The economic damage to the employee is the same regardless of whether he or she is unlawfully fired or constructively discharged.

### 1.     The Supreme Court's List of Tangible Employment Actions Was Not Intended to be Exhaustive.

As *Suders* and *Vasquez* have discussed, the Supreme Court intended to provide a non-exhaustive list of tangible employment actions. *See Suders*, 325 F.3d at 456;

---

[3]     *See also Haworth v. Romania Imported Motors, Inc.*, No. CV 00-1721, 2001 U.S. Dist. LEXIS 21508, 2001 WL 34041893, at *8 (D. Or. Dec. 27, 2001) ("Under the reasoning provided by the Supreme Court in *Ellerth/Faragher*, constructive discharge constitutes a tangible employment action as the Court contemplated by the term.").

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 14

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

*Vasquez*, 218 F. Supp. 2d at 1142-43.  The Court defined a tangible employment action as follows:

> [A] significant change in employment status, *such as* hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

*Ellerth*, 524 U.S. at 761 (emphasis added).

The use of the qualifier "such as" indicates that tangible employment actions are not limited to those that follow the qualifier.  *See Vasquez*, 218 F. Supp. 2d at 1142-43; *Suders*, 325 F.3d at 456 (3rd Cir. 2003).  Therefore, as explicitly stated in *Vasquez*, "the exclusion of constructive discharge from the list of examples does not exclude the possibility that constructive discharge may be a tangible employment action." *Vasquez*, 218 F. Supp. 2d at 1143.

### 2.   A Finding That Constructive Discharge Is a Tangible Employment Action Is Consistent With the Remedial Purposes of Title VII.

As also noted in *Vasquez*, a finding that constructive discharge constitutes a tangible job detriment is "consistent with the remedial purposes of Title VII." *Vasquez*, 218 F. Supp. 2d at 1143 (citing to *Washington County v. Gunther,* 452 U.S. 161, 178, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981) (stating that "a 'broad approach' to the definition of equal employment opportunity is essential to overcoming and undoing the effect of discrimination ... We must therefore avoid interpretations of Title VII that deprive victims of discrimination of a remedy")).  Additionally, the *Vasquez* court provided that, "[p]recluding an interpretation that constructive discharge was not a tangible employment action would be contrary to this purpose.  Such a holding would not protect an employee from the unlawful behavior of a supervisor who creates 'intolerable and discriminatory

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 15

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

working condition[s]' and would likely insulate the employer from liability if the victimized employee were forced to quit." *Vasquez*, 218 F. Supp. 2d at 1143.

### 3. The Economic Damage to the Employee is the Same Regardless of Whether He or She is Unlawfully Fired or Constructively Discharged.

A constructive discharge of an employee inflicts direct economic damage just as an actual discharge. As the Supreme Court noted, "a tangible employment action in most cases inflicts direct economic harm." *Ellerth*, 524 U.S. at 762. "No doubt, so does a constructive discharge." *Vasquez*, 218 F. Supp. 2d at 1143. *Vasquez* further provides that "the economic injury and impact to the employee is the same, i.e., loss of employment, regardless of whether he or she is unlawfully terminated from employment or constructively discharged. A constructive discharge is usually more drawn out over time and, thereby, subjects the employee to more painful abuse than a direct unlawful termination and yet, in an unfair irony, a contrary holding would leave the employee with no legal remedy for enduring the discriminatory working condition in the optimistic hope that it would stop." *Id.*

In conclusion, it is appropriate for the Court to find as a matter of law that a constructive discharge constitutes a tangible employment action. Numerous courts, including those in this Circuit, have led the way in holding that constructive discharge is a tangible employment action because the Supreme Court explicitly left open the definition of tangible employment action and because such a holding is consistent with the clear remedial purposes of Title VII. Additionally, such a holding will make employers liable for the actions of their supervisors, but still limit the number of plaintiffs as they would have the heavy burden of demonstrating a constructive discharge. *See, e.g. Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (stating plaintiff's burden of proving constructive discharge).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 16

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

C.   **CBS Is Vicariously Liable for the Conduct of Sparks Even Without a Tangible Employment Action Because It Cannot Prove the Affirmative Defense to Liability.**

Even when no tangible employment action is taken, a defending employer is nonetheless vicariously liable for the actions of an employee unless the employer can prove the affirmative defense. *See Faragher*, 524 U.S. at 807. The employer's defense consists of two <u>necessary</u> elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, *and* (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid the harm otherwise. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.

The employer bears the burden of proving its affirmative defense by a preponderance of the evidence. *See* FED. R. CIV. P. 8(c); *see also Faragher*, 524 U.S. at 807. In the present case, CBS is vicariously liable for the conduct of Ms. Sparks because it cannot prove that it exercised reasonable care to prevent and correct promptly the sexually harassing behavior and/or it cannot prove that Mr. Hardage unreasonably failed to take advantage of any corrective opportunities provided by the employer.

1.   **CBS Did Not Exercise Reasonable Care to Prevent and Correct Promptly Ms. Sparks' Sexually Harassing Behavior.**

The affirmative defense is not available to CBS because it failed to prevent and correct promptly the harassing conduct. The first prong of the *Faragher* affirmative defense requires CBS to establish that it exercised reasonable care to prevent and correct *promptly* the sexually harassing behavior committed by Ms. Sparks. *See Montero v. Agco Corp.*, 192 F.3d 856, 862 (9th Cir. 1999). While the anti-harassment policy of CBS,

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 17

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

1    on paper, looks adequate it was not followed in this case. *See* CK Decl., Ex. 16,

2    CBS/Viacom Sexual Harassment Policies at 4. An anti-harassment policy alone is not

3    sufficient to prove the affirmative defense; it must also have been followed. *See, e.g.,*

4    *Montero*, 192 F.3d at 862 (providing that employer exercised reasonable care where

5    employer took "only 11 days to complete its investigation and take action to *address*

6    Plaintiff's complaint in a decisive and meaningful fashion," and not just because they had

7    a policy in place); *see also Matvia v. Bald Head Island Mgmt, Inc.*, 259 F.3d 261, 268 (4th

8    Cir. 2001) (evidence showing that employer was deficient in enforcing its anti-

9    discrimination policy will rebut employers affirmative defense); *Gentry v. Export*

10   *Packaging Co.*, 238 F.3d 842, 847 (7th Cir. 2001) (sexual harassment policy must provide

11   for effective grievance mechanisms and therefore the mere creation of a sexual

12   harassment policy will not shield a company from its responsibility to actively prevent

13   sexual harassment in the workplace).

14   　　　　In the present case, after Mr. Hardage had filed complaints with his supervisor,

15   Ms. Dean, and the Head of Human Resources, Mr. Falcone, it is undisputed that CBS

16   took no action to approach Ms. Sparks regarding her conduct or to formally investigate

17   the complaints. Ms. Sparks admits in her testimony that the first time that she had heard

18   about Hugh's complaint was in November of 2001, over a year from when Hugh first

19   complained to Ms. Dean and Mr. Falcone:

20   　　　　Q:　　When did Patty tell you that Hugh Hardage had made a complaint of sexual

21   　　　　　　　　harassment?

22   　　　　A:　　In November of '01.

23   　　　　Q:　　Was it your understanding that he had just made the complaint?

24   　　　　A:　　Yes.

25   　　　　　　　　　　　　　　　***

26

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 18

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

Q:    Okay.  Before that time, had you ever heard that Mr. Hardage had made a complaint of sexual harassment against you?

A:    No, not sexual harassment.

Q:    Were you aware of any complaints that Mr. Hardage had made regarding you?

A:    No.

CK Decl., Ex. 3, Sparks dep. at p. 35, l. 21-p. 36, l. 1, and p. 37, ll. 3-9.

Additionally, Ms. Dean states in her deposition that after she told Mr. Rajewski of the harassment complaint made by Mr. Hardage, no investigation was made:

Q:    Okay.  Did anyone at KSTW or CBS, the broader entity, ever contact you, ask you any questions, interview you, anything of that kind regarding Mr. Hardage's complaints about Ms. Sparks?

A:    No.

CK Decl., Ex. 6, Dean dep. at p. 26, ll. 15-19.

Finally, Mr. Falcone admits that no investigation was made and that Ms. Sparks was not disciplined in any way for her actions:

Q:    Just to confirm, after the November 9th and 10th, 2000 phone call, based on your conversation with Mr. Hardage, you didn't conduct any investigation

A:    Correct.

Q:    -- of these claims?

A:    Yes.

Q:    And I take it that Ms. Sparks was never disciplined in any way?

A:    No.  I never even -- my recommendation to Ray Rajewski was that it didn't even need to be brought to Kathy Sparks' attention.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 19

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

1  CK Decl., Ex. 9, Falcone dep. at p. 56, l. 18-p. 57, l. 4.  Even worse, he left the matter

2  entirely in Mr. Hardage's hands, the victim of discrimination who feared retaliation. *See*

3  CK Decl., Ex. 9, Falcone dep. at p. 45, l. 5-p. 48, l. 21.

4       CBS's total lack of any action in response to Mr. Hardage's complaints illustrates

5  that it did not exercise reasonable care to correct and prevent promptly the harassing

6  conduct as required to establish its affirmative defense.  Reasonable care to correct and

7  prevent harassment means interviewing the complainant, alleged harasser, and witnesses,

8  taking appropriate disciplinary measures, and admonishing against retaliation.  For

9  example, in *Montero v. Agco*, the employer was found to have satisfied the first prong of

10  the *Faragher* analysis where the employer within eleven days had interviewed the

11  witnesses and the accused harasser on multiple occasions, terminated the accused

12  harasser and disciplined others, and made clear to the employees near the plaintiff that no

13  retaliation against the plaintiff would be tolerated. *Montero*, 192 F.3d at 862-63.

14       In contrast to *Montero*, Mr. Falcone, after an informal and brief meeting with Mr.

15  Hardage while driving to the airport, left the situation alone.  He did not interview Ms.

16  Sparks, Mr. Hardage's supervisor, or any of the employees who have testified in this

17  lawsuit that they witnessed sexual harassment.  Nor did he take any steps to prevent

18  further harassment or retaliation.  This violates the law as well as CBS's own policy that

19  requires an investigation once an employer is on notice of potential harassment.  *See*

20  *Cellini v. Harcourt Brace Co.*, 51 F. Supp. 2d 1028, 1039 (S.D. Cal. 1999) (recognizing

21  an employer's "clear legal duty to investigate sexual harassment claims."); EEOC

22  Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by

23  Supervisors (6/18/99), EEOC Compliance Manual (BNA), N:4075 [Binder 3] (requires

24  employer to conduct a prompt and effective investigation, take immediate action, take

25  appropriate measures to stop harassment and retaliation in order to comply with first

26

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 20

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

prong of *Faragher* analysis) also available through EEOC's web sit, at www.eeoc.gov/docs/harassment.html; *see also* CK Decl., Ex 13, CBS/Viacom Sexual Harassment Policies at 4 ("Following a complaint, a thorough investigation will be made by interviewing individual(s) allegedly responsible and any witnesses.").[4]

In sum, although CBS had a sexual harassment policy in place, that policy alone is not sufficient to establish the affirmative defense where the policy was not followed and no action was taken by the Head of Human Resources, Mr. Falcone, or anyone else within CBS to exercise reasonable care to prevent and correct promptly the harassing behavior by Ms. Sparks. An employer who takes no response to investigate sexual harassment complaints cannot be protected from liability on the basis that it *promptly* corrected and prevented the sexually harassing behavior.

> **2.    Mr. Hardage Took Advantage of the Preventative and Corrective Opportunities Available to Him By Complaining to His Supervisor and the Head of Human Resources.**

CBS also cannot establish the second element of the affirmative defense because it is undisputed that Mr. Hardage complained directly to his supervisor, Ms. Dean, and the Head of Human Resources, Mr. Falcone, regarding the inappropriate actions of Ms. Sparks. *See* CK Decl., Ex. 6, Dean dep. at p. 24, l. 20-p. 25, l. 19 (stating in her deposition that she believed that Mr. Hardage was filing a complaint for sexual harassment that she would need to report to Mr. Rajewski); *see also* CK Decl., Ex. 9, Falcone dep. at p. 52, ll. 17-20 (stating that he inferred from their conversation that Ms. Sparks was hitting on Hugh and that it made Hugh feel uncomfortable).

When an employee complains to their superiors of the conduct in compliance with the employer's grievance procedures, the second prong of the *Faragher* affirmative

---

[4]    Also, as stated above, Mr. Falcone, who is published in the Society for Human Resource Magazine, has written articles to this effect. *See* CK Decl., Ex. 10, "Hold That Thought" (cannot have a confidential or off the record discussion if it involves harassment; cannot turn a blind eye to employees' requests when you either knew or should have known about a problematic workplace situation).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 21

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

1   defense is not available to the employer. *See EEOC v. Dinuba Med. Clinic*, 222 F.3d

2   580, 587 (9th Cir. 2000). In this case, Mr. Hardage filed a complaint with Ms. Dean and

3   complained directly to the Head of Human Resources, Mr. Falcone, of the harassing

4   conduct. These actions are more than sufficient to comply with the policy of CBS

5   requiring that complaints be filed with Human Resources. *See* CK Decl., Ex. 16,

6   CBS/Viacom Sexual Harassment Policies at 4.

7        Additionally, it is not the fault of Mr. Hardage that Mr. Falcone erroneously told

8   him that he could just let the complaint sit and try to handle it on his own. The obligation

9   of the employer to investigate is clear regardless of what the employee wants (and usually

10  requests because they fear retaliation) at that point. *See Malik v. Carrier Corp.*, 202 F.3d

11  97, 106 (2nd Cir. 2000); *O'Dell v. Trans World Entertainment Corp.*, 153 F. Supp. 2d 378

12  (D.Ct. N.Y. 2001) (employer has an obligation to investigate a claim of sexual

13  harassment even when the employee decides not to proceed with the complaint). In a

14  well-reasoned analysis that is analogous to the present case, the Second Circuit provided

15  in *Malik*:

16      Nor is the company's duty to investigate subordinated to the victim's desire to let

17      the matter drop. Prudent employers will compel harassing employees to cease all
    conduct and will not, even at a victim's request, tolerate inappropriate conduct that

18      may, if not halted immediately, create a hostile environment.

19  *Malik*, 202 F.3d at 106.

20       Mr. Hardage exhausted all of the remedies available to him. He first tried to deal

21  with the situation himself by ignoring the advances of Ms. Sparks. But when her actions

22  became unbearable, it is undisputed that he went directly to his supervisor and then the

23  Head of Human Resources to complain. These actions are sufficient for the court to find,

24  as a matter of law, that Mr. Hardage did not unreasonably fail to take advantage of

25  corrective and preventative opportunities available to him. Thus, CBS cannot prove their

26

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 22

LAW OFFICES
SHORT CRESSMAN & BURGESS PLLC
999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
(206) 682-3333

456708.1/022504.00001

1  affirmative defense and they are subject to vicarious liability for any harassing conduct of

2  Ms. Sparks that the Plaintiff proves at trial.

3  ## V. CONCLUSION

4  For the reasons set out above, Plaintiff respectfully requests the Court to grant the

5
6  Plaintiff's partial motion for summary judgment that CBS is vicariously liable for the

7  actions of Ms. Sparks. Even if the Court finds that a constructive discharge does not

8  constitute a tangible employment action, CBS is vicariously liable because of their

9  inability to prove the affirmative defense, that (a) they exercised reasonable care to

10  prevent and correct promptly the harassing behavior; and (b) Mr. Hardage unreasonably

11
12  failed to take advantage of the corrective opportunities available to him.[5]

13  DATED this 27 day of July, 2003.

14  SHORT CRESSMAN & BURGESS PLLC

15
16  By _____

17      Claudia Kilbreath, WSBA No. 23144
       Alex J. Rose, WSBA No. 29474
18      Attorneys for Plaintiff Hugh Hardage

19

20

21

22

23

24

25  [5]     It is also important to note that plaintiffs retain their separate WLAD claim. *See Robel v. Roundup*, 148
26  Wn.2d 35 (2002); *Glasgow v. Georgia Pacific*, 103 Wn.2d 401 (Employer liable if it knew or should have known of
     the harassment and failed to take steps calculated to end the harassment).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (CV02-1303C) - 23

456708.1/022504.00001